IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 7, 2003 Session

## STATE OF TENNESSEE v. DENNIS RAY JONES AND PAMELA KAY BARKER

**Direct Appeal from the Circuit Court for Henry County**
**No. 13192     Julian P. Guinn, Judge**

---

**Nos. W2002-00402-CCA-R3-CD and W2002-00394-CCA-R3-CD**
**Filed February 26, 2004**

---

Appellant Dennis Ray Jones was convicted in the Henry County Circuit Court of manufacturing methamphetamine and was sentenced to three years incarceration in the Tennessee Department of Correction. Appellant Pamela Kay Barker was convicted of criminal responsibility for facilitating the manufacturing of methamphetamine and was sentenced to two years incarceration in the Tennessee Department of Correction. On appeal, the appellants raise numerous issues, including the trial court's ruling on a motion to suppress, the sufficiency of the evidence, and sentencing. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court but remand for a correction of Appellant Barker's judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JAMES CURWOOD WITT, JR., filed a separate opinion, concurring in part and dissenting in part.

Victoria L. DiBonaventura, Paris, Tennessee (at trial), and Benjamin S. Dempsey, Huntingdon, Tennessee (on appeal), for the appellants, Dennis Ray Jones and Pamela Kay Barker.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Robert "Gus" Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On July 2, 2001, the appellants were indicted on charges of manufacturing methamphetamine, a controlled substance, in violation of Tennessee Code Annotated section 39-17-417(a)(1)(C)(2) (1997 and 2003). The indictment related to the appellants' arrest on March 15, 2001, after police discovered ingredients for manufacturing of methamphetamine at Appellant Jones' property, 775 Meadows Road in Henry, Henry County.

Prior to trial, the appellants filed a motion to suppress the evidence that was seized after a search warrant was executed on Appellant Jones' property. After an evidentiary hearing, the trial court overruled the motion.

At trial, Officer John Wesley Bradley of the Henry County Sheriff's Department testified that at 9:59 a.m. on March 15, 2001, he went to 775 Meadows Road to serve a "witness subpoena" on Appellant Barker. Officer Bradley stated that at the time he did not know who owned the property; however, the address given for Appellant Barker on the subpoena was 775 Meadows Road. Officer Bradley stated that there were two buildings on the property: a mobile home and a "side shed." The shed was located fifty to seventy-five feet to the right in front of the mobile home. Officer Bradley explained that the shed was made of "older wood" and was "probably big enough for a two car garage."

Upon his arrival, Officer Bradley saw four or five cars in the driveway, and Appellant Jones was standing outside the mobile home. Officer Bradley informed Appellant Jones that he needed to serve a subpoena on Appellant Barker. Appellant Jones "yelled . . . from the yard towards the trailer home where they were living" and told Appellant Barker that there was an officer there with a subpoena for her. Officer Bradley noticed that Appellant Jones had a chrome plated revolver in his back pocket and a hunting knife strapped to his side. Officer Bradley then observed Floyd Wilbanks exit the shed and approach him and Appellant Jones. As Wilbanks drew closer, Officer Bradley "smelled a strong odor of ether in the air." At that time, Appellant Barker came out of the mobile home and Officer Bradley served the subpoena. Officer Bradley stated that he never saw Appellant Barker near the shed.

Officer Bradley explained that he did not immediately investigate the smell of ether because he did not know how many people were at the residence. Additionally, Officer Bradley knew that at least one person, Appellant Jones, was armed. Therefore, because of safety concerns, Officer Bradley left the property after serving the subpoena and drove to a nearby grocery store. Using the pay telephone at the store, Officer Bradley called Investigator Wyrick and told him that he had smelled ether at 775 Meadows Road. Officer Bradley estimated that he spoke with Investigator Wyrick less than five minutes after leaving the appellants' residence.

Next, Officer David Andrew Doyle of the Henry County Sheriff's Department testified that he went to 775 Meadows Road between 10:00 and 11:00 a.m. on March 15, 2001, to secure the premises until a search warrant for the property could be issued. When Officer Doyle arrived, there were three vehicles in the driveway, but he did not know if anyone was on the premises. Officer Doyle acknowledged that there was no strong odor of ether or starter fluid when he first arrived on

the premises. As Officer Doyle approached the mobile home, Wilbanks came out of the shed. Officer Doyle asked Wilbanks to identify the owner of the property, and Wilbanks stated that Appellant Jones was the owner and was in the shed. Officer Doyle asked Wilbanks to get Appellant Jones, whereupon Wilbanks became "loud" and "very belligerent." Shortly thereafter, Appellant Jones and Appellant Barker came out of the shed. Appellant Jones had a hunting knife strapped to his belt, but Officer Doyle did not notice a handgun.

Officer Doyle asked Appellant Jones how many people were on the property. Appellant Jones replied that there were "a couple more" people in the shed. Officer Doyle told the appellants and Wilbanks that he was there to secure the premises while a search warrant was being obtained and that he needed everyone in the yard until other officers arrived with the search warrant. At that point, Appellant Jones asked for permission to call his attorney. Officer Doyle replied that he could not prevent Appellant Jones from calling his attorney. Appellant Jones went into the mobile home for a few minutes, ostensibly to make the call. However, Officer Doyle did not follow him.

While Appellant Jones was in the mobile home, Officer Jeff Smith of the Henry County Sheriff's Department arrived to help secure the premises. Officer Doyle began to brief Officer Smith. During this briefing, Wilbanks again became "belligerent." Another officer and Officer Doyle's "sergeant" then arrived. The sergeant instructed the three individuals in the shed to move into the yard to wait for Investigator Wyrick to arrive with the search warrant. When Investigator Wyrick arrived, Officer Doyle participated in the search of the premises, starting with the shed.

Inside the shed, Officer Doyle observed an automobile with its hood up. Officer Doyle noted a faint smell of ether less than five feet from the automobile. Officer Doyle also found a wood burning stove with ashes inside. At the back of the stove, Officer Doyle discovered a pill bottle, several pieces of aluminum foil, and a scorched coffee filter. Inside the bottle "there was a white substance . . . in a hardened form. It appeared . . . to be methamphetamine." Also in the shed, officers found a "homemade pipe" made of brass or metal and an ink pen with the end covered in methamphetamine residue. Subsequently, during a search of Appellant Barker's purse, which was found on the kitchen table inside the mobile home, Officer Doyle discovered "several strips of aluminum foil."

The next witness called by the State was Investigator Scott Wyrick of the Henry County Sheriff's Department. Investigator Wyrick stated that he was experienced in drug investigations and had extensive training on the subject. Investigator Wyrick testified that he had signed the search and arrest warrants in the instant case. Thereafter, he went to 775 Meadows Road on March 15, 2001, to execute the search warrant. He stated that all of the individuals who were at 775 Meadows Road that day were arrested as a result of the search.

When asked to describe a methamphetamine laboratory, Investigator Wyrick explained:

> [A] meth lab is something as simple as . . . mason jars, aquarium
> tubing, Sudafed pills, camera batteries, ether or Acetone, denatured

alcohol. . . . It's just a sufficient combination of glassware to produce an illegal drug.

Investigator Wyrick listed the following as ingredients in the production of methamphetamine: cold pills or Sudafed pills containing ephedrine or pseudoephedrine, lithium batteries, ether or "starting fluid," coffee filters, and anhydrous ammonia. He noted that aluminum foil had little to do with the "cooking" of methamphetamine but was instead utilized in the use of the drug.

During the search of the shed, Investigator Wyrick discovered a "cannister" on a work bench. Investigator Wyrick noted that "there is a blue aqua color on the . . . brass valves on the cannister. There's also a blue aqua color that's lightly coated on the top of the tank." The investigator stated that the discoloration of the cannister indicated that it had once held anhydrous ammonia, which substance is used as an "instant cooler" in the "cooking process" of methamphetamine. Investigator Wyrick did not know how long the cannister had been in the shed, nor did he know how many times the cannister had been used.

Also in the shed, approximately ten feet from where he found the cannister, Investigator Wyrick discovered a cardboard box containing eight spray cans of ether or "starting fluid." Investigator Wyrick explained that ether is used as a solvent "to extract the Ephedrine or pseudoephedrine out of the pills." Officers also found a plastic hose, a small glass vial with powder residue on it, a white Bic pen, a bag of white powder, a homemade pipe, a set of scales, and a piece of aluminum foil. Investigator Wyrick stated that the plastic hose or tubing could be used in "turn[ing] the ether solution into a final methamphetamine product." He stated that the powder residue on the glass vial tested positive for methamphetamine.

After searching the shed, Investigator Wyrick then progressed to the mobile home. Therein, he "located a . . . lithium battery that was in the back of the toilet in the bathroom." Investigator Wyrick explained that a lithium strip inside the battery initiated the chemical reaction in the methamphetamine "cooking process." However, the battery he found had not been disassembled. Investigator Wyrick also uncovered some coffee filters floating in the toilet, a piece of "burnt aluminum foil" in a cabinet, and a baggie containing red and white pills next to a water heater. Investigator Wyrick maintained that he had seen the same or similar pills in previous methamphetamine cases. He opined that the pills were cold pills or Sudafed pills; however, he admitted that the pills had not been tested to confirm his opinion. He also related that the coffee filters did not have any indication of methamphetamine residue. Additionally, a piece of aluminum foil was found on a couch in the mobile home.

Investigator Wyrick stated that a "small bag of white powder was found in a vehicle which was parked . . . in the driveway on the property." The vehicle belonged to Charles Salyers. On cross-examination, Investigator Wyrick referred to the white powder found in Salyers' vehicle as being in a corner which was cut out of a plastic sandwich bag. He stated that "drug dealers" typically package methamphetamine "in just a corner of piece of baggie, by the gram" like the bag found in

Salyers' vehicle. Additionally, Investigator Wyrick noted that methamphetamine was generally sold for $100 per gram.

Investigator Wyrick testified that he had previously arrested Steele in connection with methamphetamine. At Steele's arrest, police found a large amount of money. Investigator Wyrick acknowledged that one reason for making methamphetamine is to sell it. He admitted that no money was found at 775 Meadows Road.

Finally, Brian Lee Eaton, a forensic scientist with the Tennessee Bureau of Investigation, testified that he had tested the white powder substances seized as a result of the search of 775 Meadows Road. All of the white substances tested positive for methamphetamine. The bag found in Salyers' car weighed .2 grams; the bag found in the shed weighed 1.3 grams; and the substance found in the bottle from the wood stove in the shed weighed 4.4 grams.

At the conclusion of the foregoing proof, the State and the defense rested. The appellants moved for judgments of acquittal, which motions were overruled. Based upon the foregoing proof, the jury found Appellant Jones guilty of manufacturing methamphetamine, a Class C felony. The jury found Appellant Barker guilty of the lesser-included offense of criminal responsibility for facilitating the manufacturing of methamphetamine, a Class D felony.

Thereafter, the trial court held separate sentencing hearings for each appellant. At Appellant Jones' sentencing hearing, both the State and Appellant Jones chose to proceed only on the information contained in the presentence report. The trial court found the existence of two enhancement factors but declined to enhance Appellant Jones' sentence. The court found no mitigating factors and thus sentenced Appellant Jones as a standard Range I offender to the minimum sentence of three years. The trial court refused to grant Appellant Jones full probation because of the deterrent effect of incarceration and because granting full probation would depreciate the seriousness of the offense. However, the trial court determined that Appellant Jones qualified for the alternative sentence of split confinement and ordered him to serve one year of his sentence in confinement with the remainder to be served in Community Corrections.

At Appellant Barker's sentencing hearing, the State submitted her presentence report. Thereafter, Appellant Barker testified that she was thirty years old and, at the time of the sentencing hearing, was living with her husband and two minor children in Huntingdon. However, in March 2001, she had been living in Obion because she and her husband were having marital difficulties. Appellant Barker testified that on March 15, 2001, she was staying with her brother, Appellant Jones, in order to help him care for his daughter. She had been there for a few days.

On March 15, 2001, Appellant Barker had been "cleaning her fingernails" shortly before Officer Bradley arrived to serve the subpoena. Three minutes before Officer Doyle arrived, she went to the shed to tell Appellant Jones about the information in the subpoena. She stated that she had not have been involved in the production of methamphetamine and was just "in the wrong place at the wrong time." In support of this contention, Appellant Barker maintained that she had previously

advised authorities that a neighbor in Huntingdon had a methamphetamine laboratory. She made the report because she was afraid that the methamphetamine "would hurt my kids." She maintained that she did not use drugs.

Appellant Barker admitted that she had been convicted of theft and violating "the check law." She stated that these were her only other criminal infractions. However, she acknowledged that the theft offense was committed in October 2001 while she was on bail for the instant offense. She also acknowledged that at the time of her October 2001 arrest, she stated that her address was 775 Meadows Road. She maintained that she was living with her mother in Obion at the time, but she could not remember her mother's address.

The trial court stated that it did not find Appellant Barker to be credible. The court also stated that it found the presence of enhancement factors but no mitigating factors. However, the court declined to increase her sentence and imposed the minimum sentence of two years. The trial court refused to grant Appellant Barker full probation because of the deterrent effect of incarceration and because granting full probation would depreciate the seriousness of the offense. Nevertheless, the trial court granted her the alternative sentence of split confinement and ordered her to serve ninety days of her sentence in confinement with the remainder to be served on supervised probation.

The appellants appealed the rulings of the trial court. The appellants raised numerous issues on appeal, namely the trial court's ruling on the motions to suppress, sufficiency of the evidence, jury instructions, disclosure of exculpatory evidence, and sentencing.

## II. Analysis

### A. Motion to Suppress

The appellants' first issue concerns the trial court's denial of the appellants' motion to suppress. However, as the State noted in its brief, neither appellant raised this issue in their motions for new trial. Tennessee Rule of Appellate Procedure 3(e) provides that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." See also State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). Accordingly, we conclude that the appellants have waived this issue and we will not address it on appeal.

### B. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Additionally, we note that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, although a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

In the instant case, Appellant Jones was convicted of manufacturing methamphetamine and Appellant Barker was convicted of criminal responsibility for facilitating the manufacturing of methamphetamine. Tennessee Code Annotated section 39-17-417 (a)(1) (1997 and 2003) provides that it is an offense to manufacture a controlled substance, such as methamphetamine. See also Tenn. Code Ann. § 39-17-408(d)(2) (1997 and 2003). Additionally, Tennessee Code Annotated section 39-11-403(a) (1997 and 2003) explains that "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."

Based upon the testimony of Investigator Wyrick, we conclude that there was sufficient evidence for the jury to find that the appellants were involved in the manufacturing of methamphetamine. See State v. Michael Joseph Cook, No. W2002-01924-CCA-R3-CD, 2003 WL 21488006, at *3 (Tenn. Crim. App. at Jackson, June 27, 2003); State v. Stephen Daniel Grande, Sr., No. W2001-00998-CCA-R3-CD, 2003 WL 21339253, at *2 (Tenn. Crim. App. at Jackson, May 16, 2003), perm. to appeal denied, (Tenn. 2003). The appellants owned or resided at the property where the components for a methamphetamine laboratory and methamphetamine were discovered. See State v. Ross, 49 S.W.3d 833, 846 (Tenn. 2001). Moreover, they were both present in the shed where many components for the manufacturing of methamphetamine were discovered. Additionally, several strips of aluminum foil were discovered in Appellant Barker's purse. Furthermore, we do not dispute the jury's finding that Appellant Barker was criminally responsible for the facilitation of the manufacturing of methamphetamine.

The appellants also complain that the trial court failed to act as thirteenth juror. Tennessee Rule of Criminal Procedure 33(f) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." When a trial court makes a determination following Rule 33(f), the court is acting as thirteenth juror. See State v.

Gillon, 15 S.W.3d 492, 500 (Tenn. Crim. App. 1997). Our supreme court has explained that "when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). In the instant case, the trial court overruled the appellants' motion for new trial after they raised the thirteenth juror issue. Thus, we presume that the trial court acted as thirteenth juror and approved the jury's verdicts. This issue is without merit.

## C. Sentencing

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (1997 and 2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellants in their own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-102, -103, -210 (1997 and 2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellants to demonstrate the impropriety of their sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Although the appellants extensively cite sentencing law, their brief is unclear as to the exact nature of their complaints regarding their sentences . Moreover, there is no argument in support of this issue, nor are there any citations to the record. Rule 10(b) of the Rules of the Tennessee Court of Criminal Appeals provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Additionally, Tennessee Rule of Appellate Procedure 27(a)(7) (emphasis added) instructs

> The brief of the appellant *shall* contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on.

Thus, we are unable to specifically address the appellants' concerns.

## D. Waived Issues

The remainder of the appellant's issues relating to the fines imposed, the jury instructions, and the withholding of exculpatory evidence, are likewise waived for failure to support those issues

with "argument, citation to authorities, or appropriate references to the record." Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7). We will not now attempt to divine the appellants' arguments on these issues.

### E. Correction of Judgment

Finally, we note that Appellant Barker's judgment of conviction reflects that she was convicted of the Class C felony of manufacturing methamphetamine. However, the trial court's reading of the jury's verdict clearly reflects that the jury convicted Appellant Barker of the Class D felony of criminal responsibility for facilitating the manufacturing of methamphetamine.[1] The presentence report also reflects that Appellant Barker was convicted of the lesser-included offense of facilitation. Furthermore, the trial court sentenced Appellant Barker according to the sentence ranges for a Class D felony. Generally, when there is a conflict between the judgment of conviction and the transcript of the proceedings, the transcript controls. See State v. Davis, 706 S.W.2d 96, 97 (Tenn. Crim. App. 1985). Accordingly, we conclude that this case must be remanded to the trial court for the correction of Appellant Barker's judgment of conviction to reflect her conviction for the Class D felony of criminal responsibility of the facilitation of the manufacturing of methamphetamine.

### III. Conclusion

In sum, we remand this case to the trial court for a correction of Appellant Barker's judgment of conviction. The judgments of the trial court are affirmed in all other respects.

_____
NORMA McGEE OGLE, JUDGE

---

[1] The jury's verdict forms were not included in the record on appeal.