**UNITED STATES of America,**

v.

**Ryan QUASHIE, Defendant.**

**14–CR–376 (BMC)**

United States District Court,
E.D. New York.

Signed February 13, 2016

Filed February 17, 2016

Erik David Paulsen, U.S. Attorney's Office, Brooklyn, NY, for United States of America.

### *AMENDED ORDER* [1]

BRIAN M. COGAN, UNITED STATES DISTRICT JUDGE.

Defendant's pending motions are disposed of as follows:

**Photo Array**

1. Defendant moves to suppress his identification from a photo array by one of the victims of his crime. He contends that under the totality of the circumstances, both the photo array and line-up were unduly suggestive and improper, and therefore should be suppressed.

2. I held an evidentiary hearing in this matter. At this hearing, the Government called two witnesses, Detective Brockman, and Mr. Salazar, a victim of the July 10, 2009, robbery.

3. Detective Brockman created and conducted the lineup in which Mr. Salazar identified defendant. Det. Brockman testified that he received an alert about

---

1. This Order corrects a typographical error that appeared in the prior Order entered on February 11, 2016.

the robbery which contained defendant's NYSID number. He testified that he believed the NYSID number came from information obtained from defendant's cellphone which was found at the scene of the crime. The NYSID allowed Det. Brockman to identify defendant and locate a photo of defendant from a prior arrest.

4. Detective Brockman used a computer program to identify other individuals who bore similar characteristics to defendant, including age, race, and certain facial features. Det. Brockman then selected five other photographs to include in the photo array. After compiling the array, Det. Brockman went to the victim's residence to have him view it.

5. Detective Brockman testified that when he first showed the victim, Mr. Salazar, the photo array, Mr. Salazar became very upset and nervous. Mr. Salazar stared down at the array. The Detective then asked Mr. Salazar if he recognized anyone from the photographs. Mr. Salazar responded by saying the word, "nothing." Det. Brockman turned the photo array over and told Mr. Salazar to calm down and not be frightened.

6. Detective Brockman decided to have Mr. Salazar view the photos one by one. He used his hands to cover up five photographs at a time and asked Mr. Salazar to focus on each single photo as Det. Brockman moved his hands to expose it.

7. Mr. Salazar responded "no" to photos 1, 2, 3, 5, and 6. However, he responded "nothing" to photo number 4 and his body language indicated he was upset. Photo number 4 was of defendant. Detective Brockman followed up with Mr. Salazar about photo 4 by asking why photo 4 was a "nothing" but the other photos were "no's". Mr. Salazar identified defendant as an individual he had seen through the peephole of his apartment door when de-fendant tried to recover his cellphone which had been left behind during the robbery.

8. After Mr. Salazar identified defendant from the photo array, Det. Brockman had Mr. Salazar initial it.

9. Mr. Salazar also testified. He explained that on the evening of July 10, 2009, he was at home with a friend. His doorbell rang and he opened the door because he thought the police were at his door. After entering his apartment, the individuals threatened him with a gun, zip tied him, and took cash and other valuables from his apartment.

10. Mr. Salazar testified that Detective Brockman returned the following day to administer a photo array. He was presented with three sheets of photographs, each with several photographs on it. Mr. Salazar testified that Det. Brockman told him to focus on the eyes of each individual in the photographs. He did not remember many details regarding the photo array. However, he testified that he did not feel that Det. Brockman had suggested any particular photograph to him.

11. Defendant bears a high burden of proving that an identification should be suppressed. The question for the Court is whether such procedures were "unnecessarily suggestive" and whether there is a "very substantial likelihood of irreparable misidentification." *United States v. Maldonado–Rivera*, 922 F.2d 934, 973 (2d Cir.1990). If the court finds that the initial procedure was unduly suggestive, it must then determine whether the identification testimony is "independently reliable," and therefore admissible. *Id.* Only in extraordinary cases should identification evidence be withheld from a jury. *See United States v. Jones*, 689 F.3d 12 (1st Cir.2012). The "presence of some element of untrustworthiness goes only to the

identifications' weight, not to its admissibility." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

12. For a photo array to be unduly suggestive, the Court must determine whether "the picture of the accused . . . so stood out from all the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir.1992) (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (brackets in original)). The array in this case was not unduly suggestive. The photographs are not so different as to suggest defendant over any other individual.

13. Defendant has objected to the process whereby Detective Brockman showed Mr. Salazar the photographs in the array one at a time. This is not impermissibly suggestive. "There is nothing inherently suggestive about a sequential display of a group of photographs." *United States v. Hall*, 14 Cr. 105, 2014 WL 2464943, at *2 (S.D.N.Y. May 13, 2014).

14. Detective Brockman asked Mr. Salazar follow-up questions and told him not to be afraid; his actions were not unduly suggestive. His acted in a professional manner to comfort a frightened witness and follow up on his statements, not to suggest a particular defendant. The procedure in the array did not lead to the likelihood of misidentification.

15. Indeed, the law is clear that although it may not reflect best police practices, it is not unduly suggestive for a police officer conducting a lineup to let the witness know that the person suspected of the crime is in fact in the lineup. As the Second Circuit held in *Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir.2007), "[k]nowledge by a complainant that the suspect is in a lineup does not, of itself, taint the lineup." ((quoting *People v. Ferrer*, 205 A.D.2d 305, 613 N.Y.S.2d 865 (1st Dep't 1994)). If that advice to a witness is not unduly suggestive, then a mere reassurance to calm a witness is not either.

16. Because I have determined that the photo array was not unduly suggestive, I do not need to determine whether Mr. Salazar's identification testimony is "independently reliable." *See Perry v. New Hampshire*, — U.S. —, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).

17. Defendant's motion [32] to suppress the photo array identification is DENIED.

**Cellphone Search**

18. During the course of the robbery that occurred on July 10, 2009, one of the robbers dropped a cellphone in the apartment where the robbery occurred. A robber attempted to recover the cellphone but was unable to reenter the apartment. A few hours later, the victim found a cellphone in his apartment and called the NYPD, which came and recovered it. The Government has stipulated that an employee of the NYPD went into the telephone and obtained the number without obtaining a warrant. Using this phone number, the police were able to determine that the phone belonged to defendant.

19. Defendant seeks to suppress the fruits of the warrantless search of his cellphone which led to the photo array identification of him. First, defendant argues that he maintained an expectation of privacy in his phone and did not abandon it. Defendant has submitted an affidavit accompanying his motion which says that "[a]t no point have I ever authorized another person to take my cellphone, personal or business, out of my home." Defendant argues in his brief that because his cellphone was stolen (although his affidavit

does not say it was stolen), he did not forfeit his reasonable expectation of privacy in the phone.

20. A defendant can only seek suppression of evidence obtained in violation of the Fourth Amendment if a defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure. *See United States v. Padilla,* 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993). Defendant must show both that he had an expectation of privacy that society is prepared to recognize as reasonable, and that he acted in such a way to indicate a subjective expectation of privacy. *See United States v. Perea,* 986 F.2d 633 (2d Cir.1993).

21. If defendant's phone was simply abandoned by him at the apartment where the robbery occurred, he has clearly relinquished his expectation of privacy in the property. *See United States v. Levasseur,* 816 F.2d 37 (2d Cir.1987) (holding that when a person voluntarily abandons property he forfeits any reasonable expectation of privacy he might have had in the property). Defendant, however, argues that his phone was stolen, and that he therefore did not voluntarily relinquish his expectation of privacy.

22. In assessing whether property was abandoned, the Court must focus on the intent of the person who abandoned the property, the robbers in this case (assuming *arguendo* that defendant was not one of the robbers). *See United States v. Lee,* 916 F.2d 814 (2d Cir.1990) (*citing United States v. Moskowitz,* 883 F.2d 1142, 1147 (2d Cir.1989)). If the phone was abandoned, a reasonable expectation of privacy in the phone was forfeited. *See United States v. Torres,* 949 F.2d 606 (2d Cir.1991). "The facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure." *Levasseur,* 816 F.2d at 44. It is not enough to simply possess property. The party must protect the right to exclude others. *Torres,* 949 F.2d at 608.

23. By leaving the phone behind in the apartment, the robbers did not protect the property and did not evince an intent to maintain an expectation of privacy in it. Even if the robbers did not intentionally abandon the phone when they first left the apartment, they returned to the scene of the crime to retrieve it, and found the door locked. At that point, the robbers voluntarily abandoned the phone and left the crime scene, rather than risk getting caught.

24. According to defendant, the analysis should center on whether defendant voluntarily abandoned the property, not the robbers who allegedly stole his phone and left it at the apartment. This approach to abandoned property does not make sense. If anytime police officers saw abandoned property, they had to consider a potential chain of custody as to who originally owned or abandoned the property, the exception to the warrant requirement would be meaningless. Thus, even if I draw the inference that defendant wants me to draw—that defendant's phone was stolen—the phone was abandoned when it was left in the victim's apartment. Once the property was abandoned, officers were free to do the limited search of the phone.

25. Second, defendant asserts that although *Riley v. California,* —— U.S. ——, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), was decided after the search of defendant's phone, the NYPD officer who searched his phone should have known that this search was unreasonable. *Riley* does not apply in this case. It outlines the standard to be applied to a search of a cellphone incident to arrest. It has nothing to do with an

abandoned cellphone or even a stolen cellphone. Although *Riley* includes language about the vast amount of information contained on cellphones and how the expectations of privacy in the contents of a phone have shifted, any objective expectation of privacy in a cellphone must go hand-in-hand with an individual's demonstration of a subjective expectation of privacy. Whether it was defendant or the robbers who left the phone in the victim's apartment, they gave up that subjective expectation of privacy.

26. Finally, even if defendant's cellphone was searched in violation of a reasonable expectation of privacy, the good faith exception eliminates the need to suppress the evidence. The exclusionary rule should be applied when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. *See Davis v. United States*, 564 U.S. 229, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). However, when "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," exclusion is not favored. *Id.* at 2427–28 (quoting *United States v. Leon*, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). At the time the police conducted this search, *Riley* had not been decided, and defendant has pointed to no authority which would have firmly established that the search of the cellphone was improper. The police therefore did not take any action in deliberate disregard of defendant's Fourth Amendment rights.

27. Defendant's motion [47] to suppress evidence obtained as a result of the search of his cellphone is DENIED.

**Defendant's Challenge to the Indictment**

28. Defendant has moved to (1) dismiss Counts Three and Five for failure to state a claim; (2) dismiss or consolidate Counts Three and Five on the grounds of duplicity or multiplicity; (3) sever Counts Four and Five from the indictment; and (4) dismiss Count One as the product of an improper joinder. Count One of the superseding indictment charges defendant with conspiracy to commit a Hobbs Act robbery, Counts Two and Four are Hobbs Act robbery counts relating to the two specific dates of the robberies, and Counts Three and Five charge violations of 18 U.S.C. § 924(c)(3), a sentencing enhancement provision.

*Counts Three & Five: Dismissal for Failure to State a Claim*

29. Defendant makes two arguments as to these counts. The first is that the Hobbs Act robbery fails to qualify as a crime of violence within the meaning of the statute. The second is that the residual clause of the statute is unconstitutionally vague under *Johnson v. United States*, 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015).

30. To qualify for a sentencing enhancement under section 924(c)(3), the Government must establish that defendant used or carried a firearm in relation to a crime of violence. The relevant portion of the statute defines a crime of violence as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C.§ 924(c)(3). The first clause is referred to as the "force clause" and the second clause is the residual clause.

31. Defendant argues that under the categorical approach, which requires courts to only look to the statutory elements of an offense, not the particular facts underlying the offense, a Hobbs Act robbery is not a crime of violence. Defen-

dant specifically argues that a Hobbs Act robbery can be accomplished by putting someone in fear of *future* injury which does not require the use, attempted use, or threatened use of violent force.

32. If a Hobbs Act robbery does not satisfy the first portion of the statute, it must fall under the residual clause of section 924(c)(3) for the indictment to be valid. However, defendant argues that the residual clause is unconstitutionally vague because it is similar to the Armed Career Criminal Act's ("ACCA") residual clause that the Supreme Court ruled was unconstitutional in *Johnson*. Defendant argues that the residual clause at issue here is equally vague and problematic.

■ 33. Both of defendant's arguments fail. To determine whether a particular violation constitutes a crime of violence under the relevant statutory provision, courts must "focus on the intrinsic nature of the offense rather than on the circumstances of the particular crime." *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir.2006). Essentially, the Court is required to evaluate whether the minimal criminal conduct that would be necessary for conviction under the Hobbs Act is a crime of violence under the force clause.

34. The statutory definition of a Hobbs Act robbery makes it clear that even the minimum conduct required for a conviction would meet the threshold for the force clause. A robbery is defined as "the unlawful taking or obtaining of personal property . . . by means of actual or threatened force, or violence, or fear of injury, immediate or future." 18 U.S.C.§ 1951(b)(1). Further, every court to consider this issue has held that a Hobbs Act robbery constitutes a crime of violence under the force clause.[2] *See United States v. Farmer*, 73 F.3d 836 (8th Cir.1996); *United States v. Mendez*, 992 F.2d 1488 (9th Cir.1993); *United States v. Anglin*, No. 14 Cr. 3, 2015 WL 6828070 (E.D.Wisc. Nov. 6, 2015); *United States v. Redmond*, No. 14 Cr. 226, 2015 WL 5999317 (W.D.N.C. Oct. 13, 2015); *United States v. Standberry*, 139 F.Supp.3d 734, 2015 WL 5920008 (E.D.Va. Oct. 9, 2015).

35. Defendant attempts to argue that a "fear of injury" does not meet the required threshold for section 924 because someone can experience a fear of injury without violent force. Defendant uses the example of an individual threatening to poison someone as conduct that would not require "violent force." However, inducing fear of physical injury involves threatening violence. Case law has held that "[w]here the victim necessarily experiences fear of bodily injury or fear of property injury, he must experience force capable of causing such injury." *United States v. Merinord*, No. 15 Cr. 136, 2015 WL 6457166 (E.D.N.C. Oct. 26, 2015).

■ 36. Even if a Hobbs Act robbery does not fall within the force clause of the statute, it would fall within the residual clause. The residual clause is not unconstitutionally vague. It includes a crime that "by its nature, involves a substantial risk that physical force against the person or property of another may be use in the course of committing the offense." This is substantively different then the ACCA clause at issue in *Johnson*, which defined a violent felony as "burglary, arson, or ex-

---

**2.** The Second Circuit has yet to address whether Hobbs Act robbery is a crime of violence under section 924(c)(3). However, in *U.S. v. DiSomma*, 951 F.2d 494 (2d Cir. 1991), the Second Circuit held that conspiracy to commit Hobbs Act robbery was a crime of violence under the Bail Reform Act. The Bail Reform Act incorporates the same definition of a crime of violence in section 924(c)(3).

tortion, [or one that] involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C.§ 924(e)(2)(B)(ii). The presence of these enumerated crimes is followed by an "otherwise" provision. That is what the Court in *Johnson* treated as determinative in holding the statute unconstitutional. The language in section 924(c), in contrast, is similar to language contained in other federal statutes, none of which have been invalidated by the Supreme Court.

37. The language in the ACCA required courts to go beyond the crime itself to consider the chances of injury after the completion of the offense. This made it difficult to determine the contours of the statute and its application. The statute in section 924(c) addresses the use of force in the course of committing the offense. The statute at issue here is thus substantively quite different from the ACCA statute and is not unconstitutionally vague.

*Counts Three and Five: Duplicity*

38. Count One charges a conspiracy that occurred between June 10, 2009, and January 25, 2010. According to defendant, this Count cites a substantive Hobbs Act robbery that occurred on each of those dates. Count Three alleges that defendant did "knowingly and intentionally use and carry a firearm during in and relation to one or more crimes of violence, to wit: the crimes charged in Counts One and Two." Defendant says it is unclear whether Count Three is referring to the June 10, 2009, or January 25, 2010, robbery.

39. Defendant also argues that if the Court allows Count One and Count Three to stand, Count Five will become multiplicitous. He argues that because Count One encompasses the conduct of January 25, 2010, and Count Three covers a portion of that as well, he cannot be guilty of Count Five, which covers the same act.

40. Defendant's argument misconstrues the indictment. First of all, Count One does not specifically state, as defendant alleges, that two Hobbs Act robberies occurred. It alleges a conspiracy between the dates of the two robberies. Additionally, each of the section 924(c) counts refers to a specific date that a robbery occurred. The jury will not be confused because they will be evaluating the conduct based on specific dates contained in Counts Three and Five.

41. For these same reasons, defendant's motion to dismiss Count Five on the grounds of multiplicity also must fail. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Regensberg,* 604 F.Supp.2d 625, 629 (2d Cir.2009) (internal quotations omitted). Count One and Count Five are not alleging the same act. Count Five is alleging the unlawful use of a firearm on January 25, 2010, during commission of a robbery. Count One is alleging the conspiracy to commit Hobbs Act robberies.

42. The Government has recognized that as Count Three is currently worded, it is clear when the gun itself was used, but it is unclear in what predicate offense the gun was used. The wording could lead a jury to conclude that the gun was used in either the predicate offense of the conspiracy or the robbery itself. As the Government has proposed, this can easily be addressed in jury instructions which will clarify the issue.

*Counts One, Four, and Five: Severance*

43. Finally, defendant argues that Counts Four and Five of the indictment should be severed because the sec-

ond robbery is not of the "same or similar character" as the first robbery. Defendant argues that the second robbery was much more coordinated and planned then the first robbery. Defendant argues that he will be prejudiced if evidence relating to both crimes is presented together.

 44. Federal Rule of Criminal Procedure 8(a) says that offenses may be joined in a single indictment when they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Offenses may be joined and tried together if they have a "sufficient logical connection" to one another. *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir.1990). In evaluating whether offenses have a sufficient logical connection to one another, "a court may consider both what is alleged in the indictment as well as the Government's pretrial representations of the evidence that will be presented at trial." *United States v. Ezeobi*, No. 10 Cr. 669, 2011 WL 3625662, at *1 (S.D.N.Y. Aug. 17, 2011).

45. Here, there were two robberies in which allegedly three of the four participants were the same. The Government has proffered that the evidence will show that a significant amount of planning went into both robberies, not just the second robbery. These witnesses will testify that the robbery crew operated as a cohesive unit based upon predetermined roles and advanced planning.

46. There is no evidence that defendant will be unduly prejudiced by having these Counts tried at the same time. The need for economy of judicial and prosecutorial resources militates in favor of only holding one trial when cooperating witnesses for the government would have to testify at multiple trials regarding overlapping sets of facts. *See United States v. Werner*, 620 F.2d 922 (2d Cir.1980).

47. Defendant's motions [61, 62] regarding the superseding indictment is DENIED.

**SO ORDERED.**